## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BRYAN KEITH H.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 23-2085-JWL** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security denying Social Security Disability Insurance (SSDI) pursuant to sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

## I.      Background

Plaintiff protectively filed an application for SSDI benefits on June 7, 2020. (R. 14, 184-88). After exhausting administrative remedies before the Social Security

---

[1] The court makes all its "Memorandum and Order[s]" available online. Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.

Administration (SSA), Plaintiff filed this case seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Plaintiff claims the ALJ erred in assessing residual functional capacity because neither the physical nor the mental functional limitations are supported by substantial evidence.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  "Substantial evidence" refers to the weight, not the amount, of the evidence.  It requires more than a scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  Consequently, to overturn an agency's finding of fact the court "must find that the evidence not only supports [a contrary] conclusion, but compels it."  I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481, n.1 (1992) (emphases in original).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala,

36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988) (brackets in Bowling)).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the process—determining at step four whether, considering the RFC assessed, claimant can perform his past

relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, he is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (citing Lax, 489 F.3d at 1084). In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work. Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC previously assessed. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999). The court addresses the errors alleged in the order presented in Plaintiff's Social Security Brief.

## II.    Physical RFC Limitations

Plaintiff claims the physical RFC assessments at both the initial and reconsideration levels were prepared by lay employees of the defendant[2] whose opinions are worthy of no weight as medical opinions. (Pl. Br. 18-19). He argues that medical professionals, Dr. Brockenbrough, and Dr. Hegde, "rubber-stamped the RFCs submitted by [the lay employees], likely along with hundreds of other pre-prepared RFCs, but that does not diminish the fact that the analysis and RFC were not, in point of fact, prepared by the medical professional[s]." Id. at 19.

---

[2] These were employees of the Kansas Disability Determination Services; available at, Disability Determination Services - Rehabilitation Services (ks.gov), (last visited, Nov. 17, 2023); called "Department of Disability Determination Services" by the ALJ (R. 24), but this fact makes no difference in Plaintiff's argument or in the court's determination.

Plaintiff continues by arguing that although Dr. Brockenbrough and Dr. Hegde did not examine him, Dr. Knoll conducted a thorough consultative examination at the request of the agency and found Plaintiff "had arthritis in many joints (primarily his knees), which made it difficult for him to stand >20 minutes before needing to rest. He had quite a bit of pain with palpation of his knees and reflex testing." (Pl. Br. 20) (citing R. 441). Plaintiff notes the ALJ found Dr. Knoll's opinion unpersuasive because it was poorly supported and inconsistent with the record. Id. (citing R. 22). He argues the limitation to 20 minutes standing is clearly Dr. Knoll's opinion despite the ALJ's assertion it appears merely to repeat Plaintiff's allegation. Id. He argues that contrary to the ALJ's finding— that Dr. Knoll did not explain the basis for her opinions—Dr. Knoll found Plaintiff had arthritis in his knees and quite a bit of pain with palpation of the knees and with deep tendon reflex testing. Id., at 21. He argues that Dr. Knoll's findings of tenderness, pain, reduced range of motion, and inability to squat without assistance are all consistent with the limitations opined. Id.

Plaintiff argues that other than in addressing the opinion of physical therapist Mr. Wasmer, the ALJ did not consider and did not account for Plaintiff's shoulder impairment or wrist impairment and failed to consider Plaintiff's left knee impairment despite MRI evidence; evidence of crepitus, intense pain, decreased strength; and Dr. Knoll's examination findings. Id. 23-24.

Finally, Plaintiff argues the ALJ erred in failing to evaluate the opinion of physician's assistant Ms. Thornton—who advised Plaintiff to elevate his legs above his heart—and erroneously found Mr. Wasmer's opinion unpersuasive. Id. 24-26.

The Commissioner argues substantial evidence in the record supports the RFC assessed by the ALJ.  (Comm'r Br. 4).  She argues despite Plaintiff's claim the prior administrative medical findings[3] were assessments prepared by state agency lay employees, not by the state agency physicians, and were merely rubber stamped by the physicians, she argues Plaintiff does not assert the RFC assessments were unauthenticated or unsigned by the physicians.  She continues,

> Whether Drs. Brockenbrough and Hegde typed the information in the forms, both doctors adopted and signed off on the state agency findings, respectively, at the initial and reconsideration levels (Tr. 73, 96).  Therefore, the Court [sic] should reject Plaintiff's argument and find there is no error in the ALJ's decision to rely on the state agency doctors' findings.

Id. at 10-11 (citing Davidson v. Colvin, Civ. A. No. 13-1136-KHV, 2015 WL 2451218, at *11 (D. Kan. May 21, 2015)

As to the physical RFC assessment specifically, the Commissioner argues the medical opinions in this case are to be evaluated pursuant to the regulations applicable to claims filed after March 27, 2017, not in accordance with the former treating physician rule.  Id. at 8-10.  She argues the ALJ evaluated the state agency physicians' opinions properly in accordance with the regulation and found them persuasive.  Id. 10.  She

---

[3] As the Commissioner suggests in her brief, the opinions of the state agency physicians, Dr. Brockenbrough and Dr. Hegde, are properly called prior administrative medical findings.  (Comm'r Br. 10).  "Prior administrative medical findings" is a term of art referring to the findings of state or federal agency physicians or psychologists about a medical issue at an earlier level of review.  20 C.F.R. § 404.1513(a)(5).  Although the term is broader in scope than a "medical opinion," id. at § 404.1513(a)(2), the terms are often used interchangeably and the court will follow that practice in this case except when necessary to draw a distinction.

argues he considered and reasonably discounted the opinion of Dr. Knoll.  Id. 11.  She

argues he properly considered the opinion of Mr. Wassmer, and reasonably found it

unpersuasive.  Id. 11-12.  Finally, the Commissioner argues the opinion of Ms. Thornton

that Plaintiff should elevate his feet above his heart is not a medical opinion within the

meaning of the regulations but is "a treatment recommendation for a temporary

condition."  (Comm'r Br. 12).

In his Reply Brief, Plaintiff argued,

> Dr. Hegde and Dr. Brockenbrough only reviewed the evidence summarized
> by [Ms.] Cohorst and [Mr.] Berglund and were directed to sign what was
> presented to them.  [Ms.] Cohorst and [Mr.] Berglund used to be called
> single decision makers (SDMs) and the Courts [sic] repeatedly held that
> these opinions were of no value as a medical opinion as held in case law
> cited in Plaintiff's Initial Brief.  Plaintiff appreciates the fact that a medical
> professional rubber-stamped the RFCs submitted by [Ms.] Cohorst and
> [Mr.] Burglund, likely along with hundreds of other pre-prepared RFCs, but
> that does not diminish the fact that the analysis and RFC were not prepared
> by the medical professional.

(Reply 1-2).  Continuing by analogy and citing 20 C.F.R. § 404.1740(b)(5) Plaintiff

argues,

> had counsel [for Plaintiff] had someone draft[] a medical opinion and
> submit[] it to a physician for signature, Plaintiff's counsel would have to
> disclose such an action.  The purpose of the regulation indicates Defendant
> would likely find an opinion prepared by a layperson and submitted for a
> rubber stamp signature by a physician to be less persuasive.

Id. 2.

Plaintiff asserts the Commissioner "offers a post hoc argument that State [sic]

agency medical consultants are highly qualified" and wonders if she thereby suggests Dr.

Knoll, whom she hired, "is not also highly qualified."  Id.  He argues the Commissioner's

"post hoc argument must be rejected." Id.  Plaintiff argues the ALJ did not consider the

relationship of the physicians with Plaintiff and had he done so, "the outcome of this

matter would have likely been entirely different." Id. 3.  He argues:

> The regulations do not permit the ALJ to ignore the lack of examining
> relationship and specifically require the ALJ to consider the factor.  The
> regulations continue to give greater consideration to a treating physician
> than a physician who only reviews the record.  "A medical source may have
> a better understanding of your impairment(s) if he or she examines you than
> if the medical source only reviews evidence in your folder." 20 C.F.R.
> 404.1520c(c)(3)(v).

(Reply 3, & n.2) (noting the articulation requirements in the Federal Register and the

Program Operations Manual as explained in John B. H. v Saul, 4:20-CV-04080-VLD,

2021 WL 1192930, *24 (D. SD. March 3, 2021)).

In his Reply Brief, Plaintiff reiterates the arguments in his Brief.  He also argues

the Commissioner's "post hoc attempt to justify the ALJ's failure to consider PA

Thornton's opinion Plaintiff was required to elevate his legs to alleviate swelling is

without merit."  (Reply 8) (citing Glasco-Parish v. Kijakazi, No. CIV-21-1009-AMG,

2023 WL 375376 at *4-5 (W.D. Okla. Jan. 24, 2023)).

A.       **Standard for Evaluating Medical Opinions**

The Social Security regulations include a section entitled "How we consider and

articulate medical opinions and prior administrative medical findings for claims filed on

or after March 27, 2017."  20 C.F.R. § 404.1520c (2017).  That regulation provides that

the Commissioner "will not defer or give any specific evidentiary weight, including

controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from your medical sources."  20 C.F.R. § 404.1520c(a) (2017).  The

regulation provides that the SSA will consider each medical source's opinions using five factors; supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding.  20 C.F.R. § 404.1520c(a)(c)(1-5) (2017).  It provides that the most important factors in evaluating persuasiveness are supportability and consistency.  Id.

The regulation explains that the decision will articulate how persuasive the SSA finds all medical opinions and prior administrative medical findings.  20 C.F.R. § 404.1520c(b) (2017).  The articulation requirement applies for each source, but not for each opinion of that source separately.  20 C.F.R. § 404.1520c(b)(1) (2017).  It requires that the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record."  20 C.F.R. § 404.1520c(b)(2) (2017).  The regulation explains that when the decision-maker finds two or more medical opinions or prior administrative medical findings are equal in supportability and consistency "but are not exactly the same," the decision will articulate the other most persuasive factors from paragraphs (c)(3) through (c)(5).  20 C.F.R. § 404.1520c(b)(3) (2017).  Finally, the regulation explains that the SSA is not required to articulate how it considered evidence from non-medical sources.  20 C.F.R. § 404.1520c(d) (2017).

**B.      The ALJ's Findings Relevant to Plaintiff's Physical RFC Arguments**

The ALJ noted that in his RFC assessment he had considered Plaintiff's allegations of symptoms in accordance with 20 C.F.R. § 404.1529 and Soc. Sec. Ruling (SSR) 16-3p and found that although Plaintiff's medically determinable impairments could cause the alleged symptoms, his statements regarding their severity "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 21). In his decision, the ALJ explained the inconsistencies upon which he relied. The ALJ noted that Plaintiff originally alleged an onset of disability on the date he quit his last job but that he reported he quit his last job when the work ended, not because of his impairments. Id. (citing R. 226, 236). The ALJ noted Plaintiff later amended his onset date to his 50th birthday, and that fact is also inconsistent with Plaintiff's allegation of disability since November 2019. The ALJ noted Plaintiff alleged far greater limitations in his September 2020 function report than were reported to his medical providers or supported by the medical evidence. Id. at 22 (citing Ex. 7E). Despite Plaintiff's allegation of disability and complaints at his consultative examination, he reported his typical daily activity was fishing. Id. (citing R. 436). Plaintiff "reported knee pain even with simple reflex testing" but "it does not appear he was mentioning this complaint to his own providers at this time." Id. (citing R. 437). Plaintiff reported numbness in the right lateral thigh due to a prior fishing accident, but that "[n]o other indication of thigh numbness is present in the record." Id. (citing R. 437). Plaintiff reported bilateral knee pain with progressive worsening but "was still able to walk 1 to 2 miles per day when hunting." Id. (citing R. 530). Finally, Plaintiff "reported abdominal pain after lifting a lot of big, heavy boxes, and he was diagnosed

with a muscle strain (Exhibit 17F, p.7[, R. 711]).  [Which] does suggest he was not

significantly limiting his activities despite his allegations."  Id. at 23.

The ALJ considered Dr. Knoll's opinion and found it unpersuasive:

Based on this exam, the examiner indicated the claimant had osteoarthritis
in multiple joints, although only a knee problem was suggested by his exam
findings (Exhibit 3F, p.7).  The examiner then opined that that it was
"difficult for [the claimant] to stand more than 20 minutes before needing
to rest" (Exhibit 3F, p.7).  This opinion appears to merely repeat the
claimant's own allegations.  Nothing in these exam findings appears to
support such a notable limitation.  While the claimant does appear to have
some limitations affecting his knees based on this exam, his exam findings
do not suggest a need for limitations to the extent alleged here.  The
examiner also provided no explanation as to the basis for these limitations.
As a result, this opinion appears to be poorly supported and inconsistent
with the record.  It was unpersuasive in this case.

(R. 22).

The ALJ discussed Mr. Wasmer's medical opinion and found it unpersuasive.

Then, in March 2022, the claimant's representative submitted an opinion
and exam findings from a physical therapist (Exhibit 17E).  The physical
therapist alleged the claimant displayed mild decreased dynamic balance,
decreased shoulder function, and decreased grip strength (Exhibit 17E).
The shoulder and grip issues do not correspond to any diagnosed medical
impairments or exam findings from the claimant's ongoing treatment
providers.  Nevertheless, based on these one-time and largely uncor-
roborated findings, the physical therapist alleged that the claimant could lift
less than 10 pounds occasionally and nothing frequently, stand and walk
only two hours per day with alternation, and has a limited ability to push
and pull.  Even with the noted findings (which are largely uncorroborated),
this appears in excess of the limited findings.  In addition, the physical
therapist alleged that the claimant could never climb (even a step), balance,
stoop (such as to sit), kneel, crouch, or crawl.  These are extreme
limitations.  Coupled with the other exertional limitations, this appears to
describe someone who struggles to or is unable to function independently.
This is not consistent with the record in this case.  It is not even suggested
by the claimant's own allegations.  As a result, this opinion was
unpersuasive.

11

(R. 23).

    The ALJ found Plaintiff

> remains capable to lift, carry, sit, stand, and walk consistent with work at
> the light exertional level.  This would limit his lifting and carrying to
> accommodate his knee and back pain, to a level that is not indicated to
> cause the symptoms associated with more heavy lifting, such as moving
> boxes and ice fishing, based on his reported activity and symptoms.

Id. 24.

    He also explained his evaluation of Dr. Hegde's opinion that Plaintiff was limited

> to a range of work at the light exertional level, which is consistent with the
> record, as discussed above.  Dr. Hughes [sic] also indicated that the
> claimant could occasionally climb ladders, ropes, and scaffolds, and stoop.
> This climbing does require good performance in both the knees and ankles,
> and significant deficits would pose a safety consideration, which supports
> notable limitations in this area.  Stooping does put strain on the spine,
> sufficient to limit his ability to perform this maneuver, based on his
> imaging.  Dr. Hughes [sic] also indicated the claimant could frequently
> perform kneeling, crouching, and crawling, which do put strain on either
> the knees (kneeling, crawling) or back (crouching), and should be limited to
> avoid exacerbating his pain complaints.  Finally, Dr. Hughes [sic] indicated
> the claimant should only occasionally be exposed to extreme cold.  This is
> reasonable, as exposure to extreme cold would be expected to exacerbate
> musculoskeletal pain.  Based on its consistency with the claimant's
> diagnosed limitations and symptoms, as well as with the claimant's
> activities, discussed above, this opinion is well supported and it is
> persuasive in this case.

(R. 24).  The ALJ noted Dr. Brockenbrough opined the same limitations and found his

opinion "was also persuasive for the same reasons."  Id.

    The ALJ found Plaintiff capable of performing light work, that he

> can lift 20 pounds occasionally and 10 pounds frequently; stand and/or
> walk for 6 hours out of an 8 hour work day with normal breaks; sit for up to
> 6 hours out of an 8 hour work day with normal breaks; and push and pull
> the same weights; except the claimant can frequently kneel, crouch, and

crawl; occasionally climb ladders, ropes, and scaffolds, and stoop; and occasionally be exposed to extreme cold.

Id. at 21.

### C. Analysis

Plaintiff's physical RFC argument is in essence an argument that the ALJ did not properly consider and evaluate the medical opinions. Plaintiff's argument that the prior administrative medical findings were not the opinions of Dr. Brockenbrough and Dr. Hegde because they were prepared by lay employees of the Disability Determination Services is specious. First, even if they were prepared by lay employees, they were considered, adopted, and signed by the physicians as their own opinions.

Second, the evidence does not suggest that the physicians were "directed to sign what was presented to them" as stated in Plaintiff's Reply Brief. (Reply 1). Rather, in the Initial determination Ms. Cohorst noted, "IN-RFC prepared, make any changes you feel necessary," (R. 63), and "Claimant has had additional tx [treatment] for knee pain, this included imaging. At this time the evidence would appear to continue to support the prior RFC. Please review and re-sign the RFC. Make any changes you feel appropriate. Additional MER [(Medical Evidence of Record)] was wrote up [sic] in the FOFAE [(Findings of Fact and Analysis of Evidence)]." Id. at 64. These are not the directions of a superior to a subordinate but, perhaps, a subordinate informing a superior, or the consideration of colleagues in an endeavor, much like the work of professionals, para-professionals, and lay workers in the practice of many professions such as engineering, accounting, architecture, medicine, and law. Moreover, many trades include office

workers, apprentices, journeymen, and master workers who keep each other advised on the progress of a job and request assistance and approval as necessary.

Similarly, in the Reconsideration determination Mr. Berglund noted, "First consult advised additional evidence, particularly on the left foot.  MER received, including x-rays.  Please see FOFAE;" (R. 86); "Please advise if we should adopt the initial RFC. Findings are mild.  He is able to do light chores, run errands, and fish unassisted;" (R. 88); I do not believe additional workup is needed on the left foot based on the left ankle/foot x-rays.  The lumbar and left shoulder MRIs show very mild findings that would not further erode a light RFC.  No heart MDI was found.  Please advise if additional evidence is still needed."  Id. at 89.

While Plaintiff alleges these lay employees used to be called single decision makers, he presents no evidence to support his allegation—whether from this record or elsewhere.  Moreover, were they SDMs previously or even if they still act as SDMs occasionally, they were not acting as SDMs in this case.  Both the initial determination and the reconsideration determination are signed by a psychological consultant and a medical consultant, each a professional in either mental or physical healthcare.  (R. 69, 73, 76, 91, 96, 99).

Finally, Plaintiff's analogy to the regulation prohibiting counsel preparing a medical opinion for a healthcare provider in one of his Social Security cases is a false analogy.  A Disability Adjudicator/Examiner of the state Disability Determination Service preparing an opinion for a medical consultant of the Disability Determination Service is not analogous to a claimant's attorney preparing an opinion for a healthcare

provider because the Disability Adjudicator/Examiner and the medical consultant are both working for the Disability Determination Service whose duty it is to process disability claims, gather and review records, and determine whether the evidence supports the disability claim.  On the other hand, the attorney's or other representative's duty is to strive to present the facts and argument in the best light to secure his client's desired objective—disability benefits—whereas the healthcare provider's duty is to present his opinion as medically and factually accurate as possible.  If the representative prepares a medical opinion for the healthcare provider, there is potential in every case that either the representative or the healthcare provider will be operating with a conflict of interest.  Although Social Security disability proceedings are not adversarial proceedings, a better analogy to the representative preparing an opinion for a healthcare provider to sign would be for the ALJ to prepare a medical opinion for the healthcare provider to sign, thereby presenting the same potential for a conflict of interest, and that is not what happened here.

The real question in this case is whether the ALJ applied the correct legal standard in evaluating the medical opinions and whether such relevant evidence as a reasonable mind might accept as adequate to support a conclusion supports the ALJ's findings.  Plaintiff's argument that Dr. Knoll's opinion should have been found more persuasive than those of the state agency medical consultants because Dr. Knoll examined Plaintiff whereas Dr. Hegde and Dr. Brockenbrough merely reviewed the record relies upon the treating physician rule rather than the regulations in effect when Plaintiff applied for benefits.  Plaintiff's assertion that the ALJ did not consider the

relationship of the physicians to Plaintiff is belied by the decision itself wherein the ALJ noted Dr. Brockenbrough and Dr. Hegde reviewed the record for the Disability Determination Services at the initial determination and reconsideration determination, respectively.  (R. 24).  Moreover, the ALJ did not discuss the opinion of Dr. Knoll by name in the decision at all but referred to her as the physician to whom Plaintiff "was referred for a consultative examination in October 2020 to assess his condition."  Id. at 22.  The decision reveals the ALJ applied the correct legal standard from 20 C.F.R. § 404.1520c when evaluating the persuasiveness of the decisions, including considering the relationship of each medical source to Plaintiff.

As noted supra at pp.10-11, the ALJ discounted Plaintiff's allegations of symptoms based upon numerous inconsistencies in the record evidence including three inconsistencies revealed in his examination by Dr. Knoll: despite Plaintiff's allegation of disability and complaints, he reported his typical daily activity was fishing; Plaintiff reported knee pain even with simple reflex testing but did not mention it to his own providers at the time; and Plaintiff reported numbness in the right lateral thigh due to a prior fishing accident, but no other indication of thigh numbness is present in the record.

In finding Dr. Knoll's opinion unpersuasive, the ALJ stated that her opinion regarding Plaintiff's difficulty standing more than 20 minutes before needing to rest "appears to merely repeat [sic] the claimant's own allegations," none of Dr. Knoll's exam findings support such a notable limitation, and she did not provide an explanation of the basis for her limitations.  He found, "As a result, this opinion appears to be poorly supported and inconsistent with the record.  It was unpersuasive in this case."  (R. 22).

16

Plaintiff objects to the ALJ characterizing the limitation to 20 minutes standing as repeating the claimant's allegations.  But as the ALJ suggests, that is a notable limitation unsupported by any notable exam findings by Dr. Knoll.  Plaintiff argues Dr. Knoll provided an explanation of the basis for her limitations in that she found arthritis in both knees, and "quite a bit of pain" with palpation of the knees and with deep tendon reflex testing.  (Pl. Br. 21).  However, while the presence of pain and arthritis may be consistent with a standing limitation, their presence does not in every case require a limitation to twenty minutes of standing and Dr. Knoll did not explain why they do so in this case.  Moreover, the ALJ found the record not consistent with Plaintiff's allegations of limitations particularly his pain with deep tendon reflex testing.  Further, pain, tenderness, reduced range of motion, and inability to squat without assistance are all signs or symptoms to a great extent dependent upon the subjective reports of Plaintiff which the ALJ discounted for reasons supported by the record evidence and Plaintiff does not contest his analysis.

The ALJ found the opinions of Dr. Brockenbrough and Dr. Hegde persuasive because they are consistent with Plaintiff's diagnosed limitations and symptoms, as well as with his activities, and are well supported in this case.  Other than arguing that Dr. Knoll's opinion was more persuasive than the medical consultants' opinions, Plaintiff does not argue error in the rationale for finding these opinions persuasive.

The court is uncertain of Plaintiff's argument the ALJ did not consider or account for his shoulder impairment, wrist impairment, or left knee impairment.  As Plaintiff acknowledges, Dr. Knoll examined him, found bilateral knee pain, limited range of

motion of both knees, ability to rise from a sitting position without assistance, no difficulty getting on or off the examining table in a supine position, and inability to perform a partial squat without assistance.  (R. 438-41).  Above, the court found no error in the ALJ's evaluation of Dr. Knoll's opinion and Plaintiff does not point to evidence which compels finding greater knee limitations than those assessed by the ALJ.

Regarding the alleged wrist impairment, Plaintiff ignores that the physician assistant to whom he appeals in support of finding that impairment referred to it as a strain/sprain for which there is no treatment and of which it can take time to heal.  Id. 383.  X-rays of the wrist revealed no acute fracture or malalignment.  Id. 385.  Plaintiff points to no evidence compelling finding permanent limitations not assessed in the RFC.

Finally, regarding the alleged shoulder impairment, Plaintiff acknowledges the ALJ considered it when addressing the opinion of the physical therapist, Mr. Wasmer.  (Pl. Br. 22).  In fact, the ALJ found Mr. Wasmer's finding of decreased shoulder function does "not correspond to any diagnosed medical impairments or exam findings from the claimant's ongoing treatment providers."  (R. 23).  He found the opinion unpersuasive because it consisted of extreme limitation and "appears to describe someone who struggles to or is unable to function independently," which is not consistent with the record or "even suggested by the claimant's own allegations."  Id.  Plaintiff shows no error in the rationale given by the ALJ but attempts to support Mr. Wasmer's opinion by citing an August 12, 2021, treatment note by an APRN, Ms. Gubiloso, to whom Plaintiff was "referred for atypical chest and arm pain."  (R. 662).  However, the referral was for atypical arm pain, not decreased shoulder function.  As the ALJ found, the decreased

18

shoulder function does not correspond to any diagnosed impairment or other examination finding. Moreover, a physical therapist is not an acceptable medical source, 20 C.F.R. § 404.1502, and "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521.

In his last argument about assessing physical RFC, Plaintiff claims the ALJ erred in failing to evaluate Ms. Thornton's opinion that Plaintiff should elevate his legs above his heart. The Commissioner provides no authority for her suggestion that a treatment recommendation for a temporary condition is not, in fact, a medical opinion and need not be evaluated by the ALJ. Nonetheless, the court finds that the error was harmless and does not require remand.

The record reveals that the swelling in Plaintiff's right knee was an acute problem apparently caused by "a dry needling session a couple of weeks ago at which time he developed quite a bit of swelling over the lateral aspect." (R. 618). Ms. Thornton explained her plan for treatment:

> [Plaintiff] deferred corticosteroid injection today and has a prescription of oral anti-inflammatory medication ready at his pharmacy. I advised he work on home exercises for the rest of the week and then restart formal therapy next week to allow the swelling to abate. He is encouraged to elevate the leg above the level of the heart and apply ice.

Id. 621. In context it is clear Ms. Thornton expected the swelling to subside within the week and advised Plaintiff to elevate his leg and apply ice to aid in that process. In this circumstance, Plaintiff cannot show a limitation which would interfere with work on a continuing basis, and he does not cite any record evidence demonstrating this is a permanent limitation.

### III.    Mental RFC Limitations

Plaintiff points out that although the ALJ found Plaintiff's mental impairments not severe at step two of his analysis, he found that Plaintiff had mild limitations in two of the four broad mental functional areas—interacting with others; and concentrating, persisting, or maintaining pace.  (Pl. Br. 26).  He claims the ALJ erred in failing to assess any mental limitations in the RFC, arguing that mild limitations are not equivalent to no limitations.  Id., at 27 (citing Wells v. Colvin, 727 F.3d 1061, 1071 (10th Cir. 2013) ("[T]o the extent the ALJ relied on his finding of non-severity as a substitute for adequate RFC analysis, the Commissioner's regulations demand a more thorough analysis. See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)."); Farrill v. Astrue, 486 F. App'x 711, 713 (10th Cir.2012) (concluding that the ALJ erred by failing to explain at steps 4 and 5 why he did not include any mental limitations in the RFC despite his previous assessment of mild limitations); McFerran v. Astrue, 437 F. App'x. 634, 638 (10th Cir. 2011) ("[T]he ALJ made no findings on what, if any, work-related limitations resulted from Mr. McFerran's nonsevere mood disorder and chronic pain.  He did not include any such limitations in either his RFC determination or his hypothetical question.  Nor did he explain why he excluded them.  In sum, we cannot conclude that the Commissioner applied the correct legal standards."); Mushero v. Astrue, 384 F. App'x. 693, 695-96 (10th Cir. 2010) (where ALJ failed to include even non-severe limitations in RFC and hypothetical, reversal and remand required); Grotendorst v. Astrue, 370 F. App'x. 879, 884 (10th Cir. 2010) ("[O]nce the ALJ decided, without properly applying the special technique, that Ms. Grotendorst's mental impairments were not severe, she gave those

20

impairments no further consideration.  This was reversible error."); <u>Schoonmaker v.</u>

<u>Berryhill</u>, Case No. CIV-16-1145-R, 2017 WL 4422597, at *3 (W.D. Okla. Oct. 5, 2017)

("This conclusion distorts the relevant question and frames the Step 2 'no severe

impairment' finding as determinative at Step 4. However, "[a]ll medically determinable

impairments, including non-severe impairments, must be taken into account in assessing

a claimant's RFC.").

     Plaintiff points out the psychological consultants, Dr. Posey and Dr. Kaspar, also

found mild limitations in the broad mental areas of interacting with others; and

concentrating, persisting, or maintaining pace and the ALJ found their opinions

persuasive.  (Pl. Br. 27).  He claims the ALJ erred because he failed to account for these

mild limitations in the RFC assessed or in the hypothetical questions presented to the

vocational expert (VE) and failed to explain why he did not include these limitations in

the RFC assessed.  <u>Id.</u> at 27-28 (noting that SSR 96-8p requires an ALJ to explain how

ambiguities in the evidence were resolved and why a medical opinion conflicting with the

RFC assessed was not adopted).

     Plaintiff claims the ALJ erred in finding the opinion of the examining

psychologist, Dr. Schwartz, unpersuasive because the ALJ overlooked Dr. Schwartz's

findings of very basic abstract reasoning and limited recall after five minutes.  He also

argues that contrary to the ALJ's finding, the intervening event now limiting him to

simple instructions is his current impairments causing and including his adjustment

disorder with depressed mood due to physical symptoms.  (Pl. Br. 28-30).

The Commissioner argues the ALJ "reasonably determined that Plaintiff had no workplace mental restrictions and was not limited to unskilled work, and his determination was supported by substantial evidence." (Comm'r Br. 5). She argues the evidence supports that Plaintiff is of low average intelligence but does not reveal any cognitive shortcomings. Id. at 6. She points out Dr. Posey and Dr. Kaspar found Plaintiff "had mild limitations regarding mood but was still able to work with others and concentrate on tasks. Id. 7 (citing R. 69, 91). She argues the psychological consultants found no functional limitations related to the ability to work. Id. 7-8.

In his Reply Brief, Plaintiff repeats her earlier arguments, argues the Commissioner parsed her language in asserting the consultants' opinions did not find severe limitations, and highlights the consultants finding mild limitations and little limitations, noting that neither means no limitation. (Reply 10-11).

A.      **The ALJ's Mental Findings**

The ALJ found that Plaintiff has "medically determinable mental impairments of major depressive disorder, adjustment disorder with depressed mood due to physical symptoms, and generalized anxiety disorder" which are not severe. (R. 18). He noted Plaintiff reported mental symptoms and impairments to the SSA despite that the initial records revealed no mental symptoms, complaints, or diagnoses thereby prompting a referral for a mental evaluation. Id. The referral resulted in a global assessment of functioning (GAF) score of 39, but "no objective exam findings or apparent deficits in presentation were described." (R. 18). He explained the GAF score "is a quite low score; however, this is a one-time snapshot of his presentation, and, based on these

records, it appears to be based almost entirely on his allegations.  It is also no longer

treated as an opinion given the current rules [for evaluating medical evidence].  Thus, this

was of little usefulness in assessing his ongoing mental condition."  Id.

The ALJ noted that because of the lack of objective findings Plaintiff was referred

to a psychologist, Dr. Schwartz, for a consultative exam.  The ALJ noted Dr. Schwartz

opined that Plaintiff was limited to understand and follow simple instructions, but found:

> his exam … did not suggest any reason at all why the claimant would be
> limited to only simple instructions.  Although he appeared to perform at
> low average intelligence, nothing in the record suggests this is a decrease in
> his functioning, or that there was any intervening event that would have
> lowered his functioning in this area.  Thus, as he was previously able to
> perform skilled and semi-skilled work, there is nothing to suggest he
> needed to be limited to simple work based on this one finding.  Otherwise,
> there is no support either in this exam or other records for such an opinion.
> Given these issues, this opinion is unsupported and inconsistent with the
> record, and it was unpersuasive in this case.

Id. at 18-19.  The ALJ found the state agency psychological consultants' opinions were

persuasive because they were:

> consistent with the claimant's exam findings in this case, which do not
> indicate any objective evidence of a cognitive or other deficit in mental
> functioning.  Moreover, despite his allegations, his presentation was also
> consistent with only non-severe impairments.  Thus, although other
> providers, above, offered opinions indicating limitations were present, this
> non-severe opinion remains consistent with and supported by the records
> associated with those opinions.

Id. 19.  In his "paragraph B" analysis, the ALJ found limitations in only two of the four

broad mental functional areas:

> In [interacting with others], the claimant has mild limitation.  In his
> function report, the claimant alleged no problems getting along with others
> (Exhibit 7E, p.7).  In addition, he reported no changes in his social abilities
> after the alleged onset date in this case (Exhibit 7E, p.7).  He also indicated

23

that he remained able to spend time with others, including going fishing
and going grocery shopping (Exhibit 7E, p.6, 7).  The claimant has alleged
limited activities due to his physical symptoms, but nothing in the record
suggests any apparent issues with social functioning.  As his subjective
views of his depressed mood and anxiety could pose a barrier to successful
social interaction, these complaints were given some consideration in this
area, but the lack of objective issues with presentation and interaction do
suggest this is no more than a mild deficit.

(R. 19).

In [concentrating, persisting, or maintaining pace], the claimant has mild
limitation.  In his function report, the claimant alleged problems with
concentration, alleging he cannot pay attention for long (Exhibit 7E, p.8).
Although he reported issues with persistence, he also indicated he was able
to complete tasks (Exhibit 7E, p.8).  Despite these allegations, no such
issues were identified in his medical records, and on [sic] deficits in
concentration, persistence, or related areas were indicated on exam.  During
his most recent mental exam, above, he also denied any issues with
concentration.  Although his pain and subjective mental complaints could
pose a barrier to effective concentration, given his mental findings, this is
no more than a mild deficit.

Id. 20.  The ALJ went on to note that the consideration of the severity of mental

impairments by considering the four broad mental functional areas at steps two and three

of the sequential evaluation process is not an RFC assessment which requires a more

detailed assessment.  He explained his RFC "assessment reflects the degree of limitation

the undersigned has found in the 'paragraph B' mental function analysis."  Id.

The ALJ assessed an RFC which did not include any limitations in the mental

abilities required to perform unskilled, semiskilled, or skilled work.  See Program

Operations Manual System (POMS) DI 25030.010.  He assessed an RFC for a range of

light work limited by Plaintiff's physical limitations.  (R. 21).  He explained,

To determine the extent to which these limitations erode the unskilled light
occupational base, the Administrative Law Judge asked the vocational

24

> expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

Id. at 26.  The ALJ found Plaintiff capable of making an adjustment to other work existing in significant numbers in the nation based upon the VE's testimony that an individual of Plaintiff's age, education, work experience, and RFC would be able to perform jobs represented by the three light, unskilled occupations of a routing clerk, a marker, and a garment sorter consisting of a total of 131,000 jobs nationwide.  Id.

### B.    Legal Standard Applicable to Considering Mental Impairments

The Commissioner has promulgated a Psychiatric Review Technique (PRT) for evaluating mental impairments.  20 C.F.R. §§ 404.1520a, 416.920a (2022).  In evaluating the severity of mental impairments at steps two and three, the technique provides for rating the degree of functional limitation in each of four broad mental functional areas: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  Id. §§ 404.1520a(c)(3) 416.920a(c)(3). After rating the degree of limitation in each functional area, the Commissioner determines the severity of a claimant's mental impairments.  Id. §§ 404.1520a(d), 416.920a(d).

When the four broad mental functional areas are rated as "none" or "mild," the agency will conclude at step two of the sequential evaluation process that Plaintiff's mental impairments are not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  Id. §§ 404.1520a(d)(1), 416.920a(d)(1).  If the mental impairments are severe, the technique

requires an evaluation of whether the impairment meets or equals a listed impairment by comparing the step two findings and the medical evidence with the criteria of the listings. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).  The four broad mental functional areas are also used in defining the Paragraph B criteria of most of the Listings of mental disorders.  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00C; see also, 12.00A (all mental disorder Listings except 12.05 and 12.09 contain Paragraph B criteria).  If the Commissioner determines that Plaintiff's mental impairments do not meet or equal a listing, he will then assess Plaintiff's RFC.  20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In determining RFC, the regulations provide that the Commissioner will consider Plaintiff's "ability to meet the physical, mental, sensory, and other requirements of work." Id. §§ 404.1545(a)(4), 416.945(a)(4).  The regulations provide that "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [Plaintiff's] ability to do [work.]"  Id. §§ 404.1545(c), 416.945(c).  The POMS provides that the basic mental demands of competitive, remunerative, unskilled work are:  the ability to understand, carry out, and remember simple instructions; the judgment to make simple work-related decisions; the ability to respond appropriately to supervision, coworkers, and work situations; and the ability to deal with changes in routine work setting.  DI 25020.010(A)(3)(a).

The Commissioner has clarified the difference between evaluating the severity of mental limitations at steps two and three of the sequential evaluation process based upon the broad functional areas identified in the PRT and assessing mental RFC.  SSR 96-8p,

West's Soc. Sec. Reporting Serv., Rulings 146 (Supp. 2018).  "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in" the four functional areas.  Id.  RFC must be expressed in terms of specific work-related functions.  Id. at 147.  "Work-related mental activities generally required by competitive, remunerative work include the abilities to:  understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  Id. at 148.  Therefore, an ALJ should not state a mental RFC in terms of the four functional areas but should make a function-by-function assessment of each of the work-related mental activities relevant to the case at hand.  Id. at 144.

### C.    Analysis

Solely for the ease of deciding this case, the court will assume without deciding that the ALJ erred in finding unpersuasive Dr. Schwartz's opinion Plaintiff is limited to understand and follow only simple instructions.  (R. 628).  Assuming this was error, the error was harmless.  As noted above, unskilled work requires only the ability to understand, carry out, and remember simple instructions.  POMS DI 25020.010(A)(3)(a).  Moreover, although the ALJ did not limit Plaintiff to unskilled work, all three representative occupations upon which he relied to find work that exists in significant numbers in the national economy were light, unskilled (Specific Vocational Preparation level 2) occupations.  (R. 26).  Thus, it follows that a significant number of light, unskilled jobs of which Plaintiff is capable exist in the national economy.

Plaintiff's argument that his mild limitations—in interacting with others and in concentrating, persisting, or maintaining pace—require greater RFC limitations is also unavailing. Other than Dr. Schwartz's limitation to simple instructions, Plaintiff points to no other mental limitation which should have been included in the RFC assessed. As quoted supra at 24, the ALJ explained his finding of mild limitations in these two broad mental functional areas, his findings are supported by the record evidence, and Plaintiff points to no record evidence compelling a different result. And, the Commissioner has recognized that none or mild limitations in the four broad mental functional areas indicate only a minimal limitation in the ability to do basic work activities "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Moreover, Dr. Schwartz opined that Plaintiff "would be able to maintain adequate interpersonal relations in a competitive work environment" and "would be able to maintain adequate concentration, persistence, and pace on the job." (R. 628). Thus, the ALJ, the state agency psychological consultants, and Dr. Schwartz all agreed that Plaintiff did not have any mental limitations that would prevent at least unskilled, light work. Even though the ALJ found Dr. Schwartz's limitation to simple instructions unpersuasive, he acknowledged he questioned the VE "[t]o determine the extent to which these limitations erode the unskilled light occupational base." Id. at 26.

Finally, the court notes that the cases relied upon in Plaintiff's argument may be distinguished and do not compel a different outcome. As Plaintiff argues, the Tenth Circuit in Wells found the ALJ erred in relying of a finding of non-severity as a substitute

for adequate RFC analysis.  Wells, 727 F.3d at 1071.  However, in the paragraph immediately prior to the quotation in Plaintiff's Brief, the court explained the error was that the ALJ had applied a mistaken chronology and used Ms. Wells's pre-onset work which "cast doubt on the validity of his analysis, and we cannot credit his conclusion with substantial evidence."  Id.  And, the court noted the ALJ had rejected two medical opinions which opined moderate and marked limitation.  Id.  That is not the case here.

Farrill was a case in which the ALJ found Ms. Farrill could return to her past relevant work.  Farrill, 486 F. App'x at 713.  The court found the controlling issue was the ALJ's lack of compliance with the three-part framework for establishing whether a claimant can return to her past relevant work set forth in Winfrey v. Chater, 92 F.3d 1017 (10th Cir.1996).  Id. 486 F. App'x at 712.  The court found that the ALJ did not specify Ms. Farrill's mental abilities or the mental demands of her past relevant work and could not have compared her mental abilities with the mental demands of her past work.  Id. at 713.  Here, there is no finding Plaintiff could do any of his past relevant work.

The court distinguishes McFerran for two reasons.  The Tenth Circuit determined the ALJ's credibility assessment was erroneous and "must be set aside" and because credibility and RFC determinations are inherently intertwined, "[i]f the ALJ reaches a different credibility assessment on remand, it may be necessary to revise Mr. McFerran's RFC." 437 F. App'x 637.  At that point the case was decided, but the court went on in dicta to provide an advisory opinion on other potential defects in the ALJ's RFC assessment.  Id. at 638.  Moreover, the court's suggestion of error in not assessing some limitation in mental RFC rested upon SSR 96-8p's caution that "While a 'not severe'

29

impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." McFerran, 437 F. App'x at 638 (citing SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996)). Here, however, it is clear the ALJ, Dr. Schwartz, and the state agency psychological consultants considered Plaintiff's limitations resulting from his physical impairments.

Mushero did not even contain the issue Plaintiff argues is error in this case. As that court noted, the ALJ in that case did not apply the Commissioner's PRT, he recognized the existence of the impairment (depression) "but he assessed its severity without first making the required findings regarding limitations in each of the four broad functional areas," and he did not even discuss "an agency psychiatrist's assessment that Mr. Mushero had mild limitations on social functioning and on maintaining concentration, persistence, or pace." Mushero, 384 F. App'x. at 695.

The ALJ in Grotendorst was presented with the opinions of two state agency psychological consultants that the claimant had a moderate limitation (not only in a broad mental functional area) but in the specific "ability to maintain attention and concentration for extended periods." Grotendorst, 370 F. App'x. at 883. The ALJ did not mention one of the opinions and rejected the other because the claimant did not have a severe mental impairment. Id. at 884. The court determined there was reversible error in this circumstance because "once the ALJ decided, without properly applying the special technique, that Ms. Grotendorst's mental impairments were not severe, she gave those impairments no further consideration." Grotendorst, 370 F. App'x at 884. The ALJ

clearly erred in applying the PRT because she found a mental impairment not severe despite that the claimant had a moderate limitation in a specific mental ability and despite that the regulations classify a mental impairment as not severe only if limitations in the four broad mental functional areas are mild or none.  20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).  Here, the ALJ properly applied the PRT and none of the psychologists in the record determined that Plaintiff had moderate limitations in any mental ability.

Finally, the Schoonmaker decision rests upon the fact the ALJ ignored Dr. Cruse's opinion regarding Plaintiff's mental limitations and after a cursory consideration of the plaintiff's mental health (again ignoring Dr. Cruse's opinion) she concluded "there is nothing showing [Plaintiff's] condition is at a severe level of limitations or impairment." 2017 WL 4422597, at *3.  Here, Plaintiff has shown no opinions which the ALJ ignored.

Plaintiff has not met her burden to shown harmful error in the Commissioner decision.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated November 20, 2023, at Kansas City, Kansas.

s/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**